946 F.2d 884
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
James K. BARNES, M.D., Plaintiff-Appellee,
v.
SAINT ALBANS PSYCHIATRIC HOSPITAL, INCORPORATED, Defendant-Appellant,
and
Robert L. Terrell, Jr., Neil M. Dubner, M.D., Defendants.
 No. 90-2244.
 United States Court of Appeals, Fourth Circuit.
 Argued June 7, 1991.
Decided Oct. 8, 1991.
 
 Appeal from the United States District Court for the Western District of Virginia, at Roanoke. Jackson L. Kiser, District Judge. (CA-89-687-R)
 Argued: Clifford Lee Harrison, Stone, Hamrick, Harrison & Turk, P.C., Radford, Va., for appellant.
 Charles James Williams, III, Gentry, Locke, Rakes & Moore, Roanoke, Va., for appellee.
 On Brief: Edwin C. Stone, Stone, Hamrick, Harrison & Turk, P.C., Radford, Va., for appellant.
 S.D. Roberts Moore, Gentry, Locke, Rakes & Moore, Roanoke, Va., for appellee.
 W.D.Va.
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 Before PHILLIPS and NIEMEYER, Circuit Judges, and MERHIGE, Senior United States District Judge for the Eastern District of Virginia, Sitting by Designation.
 OPINION
 PER CURIAM:
 
 
 1
 Dr. James K. Barnes sued St. Albans Psychiatric Hospital, Inc., for breach of a written employment contract, claiming that the hospital had failed to pay him for his outpatient services. St. Albans asserted that the contract had been modified and that Dr. Barnes had waived his contractual right to that remuneration. Rejecting St. Albans' position, the district court entered a judgment in favor of Dr. Barnes in the amount of $31,507.61. For the reasons that follow, we conclude that the contract was modified, but we agree with the district court that Dr. Barnes did not waive his right to the remuneration earned prior to the modification.
 
 
 2
 * St. Albans, a private psychiatric hospital in Pulaski County, Virginia, recruited and hired Dr. Barnes. The written contract of employment, which was dated August 23, 1985, provided that Dr. Barnes was employed as a staff psychiatrist with
 
 
 3
 An annual salary of $125,000.00 ... The appropriateness of this salary amount, as well as the relationship as employee of the hospital will be evaluated by both parties at the end of six months, at which time the salary may be increased upon the financial experience of the hospital. It is also understood that the salary will not be decreased below the guarantee of $125,000.00 per year during the first year....
 
 
 4
 J.A. 9. The contract expressed the desired expectation that Dr. Barnes would maintain an outpatient practice as a "necessary corollary to inpatient work." Remuneration for the outpatient practice would be in addition to the inpatient remuneration and would, for the initial year, be 70% of the charges made. Dr. Barnes' employment commenced on October 14, 1985, and he remained as a full-time staff psychiatrist until January 1987, when he became a non-employee staff member with privileges to practice at St. Albans.
 
 
 5
 Contending that St. Albans failed to pay him for the outpatient work which he performed while a staff psychiatrist, Dr. Barnes filed a complaint in August 1989 in which he alleged a claim for breach of contract. St. Albans admitted that it did not pay Dr. Barnes, but it argued that the contract was orally modified and Dr. Barnes voluntarily gave up his right to the remuneration. This modification is alleged to have taken place in a conversation between Dr. Barnes and Mr. Robert Terrell, chief executive officer of St. Albans. Dr. Barnes and Terrell presented differing versions of this conversation. According to Terrell, the conversation took place in January 1986 when Dr. Barnes came to Terrell's office and said that he was not a "money monger" and that he did not expect additional remuneration for the outpatient work. In Dr. Barnes' version, the conversation took place in June 1986 and centered on why he was not being paid for the outpatient services. According to Dr. Barnes, Terrell told Dr. Barnes that he was not living up to the contract and that the hospital was losing money on him. Terrell then said, "I don't think we should pay you for your outpatient services." Barnes responded that he did not want to be responsible for the hospital losing money and said, "If you live up to the rest of the contract, I am not going to push you if you are losing money on me."
 
 
 6
 The district court found Terrell's version of the meeting incredible and credited Dr. Barnes' version. It concluded, however, that neither version of the conversation amounted to a modification of the contract and that Dr. Barnes did not waive his right to be compensated for outpatient services.
 
 II
 
 7
 Under Dr. Barnes' version of the facts, which the district court credited and to which we now hold Dr. Barnes, Terrell advised Dr. Barnes in June 1986 that the hospital was losing money on him and Barnes should not be paid the additional remuneration for outpatient services. Dr. Barnes, apparently agreeing, responded, "If you live up to the rest of the contract, I am not going to push you if you are losing money on me." No additional compensation was thereafter paid for outpatient services, although none had been paid up to that time either.
 
 
 8
 We conclude that that exchange was sufficient to deny Dr. Barnes any compensation for outpatient services rendered after June 1986. While the exchange evidences a mutual understanding of the manner in which the parties would proceed thereafter, mutual consent was not necessary to terminate or alter the employment relationship because at that time the contract was one which continued at-will.
 
 
 9
 The written contract between the parties seems to have guaranteed the salary and benefits to Dr. Barnes for six months, after which, as the contract provides, "[t]he appropriateness of [the] salary amount, as well as the relationship as an employee of the hospital will be evaluated by both parties." After six months the term of contract is left open. Under Virginia law, when "the intended duration ... cannot be determined by fair inference from the terms of the contract," the contract is terminable at the will of the parties. Miller v. SEVAMP, Inc., 362 S.E.2d 915 (Va.1987). Because the employer can terminate an at-will employee at any time, it follows that the employer can, simply on notice, also unilaterally reduce the salary of an at-will employee.
 
 
 10
 Thus, the contract between Dr. Barnes and St. Albans guaranteed a term of six months. Thereafter, the relationship continued at-will and could be reviewed or modified by either party. When Terrell therefore advised Dr. Barnes in June 1986 that no more remuneration for outpatient services would be paid and none was paid, Dr. Barnes was adequately notified of the modification.
 
 
 11
 We agree with the district court that the exchange in June 1986 does not support a waiver by Dr. Barnes of fees earned before then.
 
 
 12
 Indeed, his testimony demonstrates that the entire reason for the June 1986 conversation was his inquiry into why he was not receiving the outpatient remuneration.
 
 III
 
 13
 In awarding damages the district court used St. Albans' answers to interrogatories in which St. Albans admitted having billed $45,010.87 for outpatient services performed by Dr. Barnes during his tenure at the hospital. This figure included the period from October 14, 1985 through December 31, 1986, although no services were apparently billed until January 1986. Applying the 70% factor provided for in the employment contract, the court awarded damages of $31,507.61.
 
 
 14
 The contract by its terms, however, provides that the 70% rate would apply only for the "initial year," which ended October 14, 1986. Since the district court awarded fees for services after October 14, 1986, the amount of damages is clearly overstated and must, at least for that reason, be recomputed. Because we also hold that the contract was modified by the conversation that took place in June 1986, the district court shall reduce damages to that extent as well.
 
 
 15
 Accordingly, we remand this case to the district court to recompute the damages Dr. Barnes sustained for the non-payment of fees for outpatient services, but only up until the time of his conversation with Terrell in June 1986.
 
 
 16
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED WITH INSTRUCTIONS.